## SCOTT *v.* FOUR HUNDRED AND FORTY-FIVE TONS OF COAL.

*(District Court, D. Connecticut.     June 29, 1889.)*

**1. SALVAGE—COMPENSATION.**

A schooner laden with coal struck and sank in very dangerous water at the entrance of Long Island sound, only the main rail being out of water. The locality was an exceptionally bad one in which to save either vessel or cargo. Libelant, the owner of a wrecking equipment, offered to save the top-hamper for 50 per cent. of its value, if successful. and subsequently offered to save it for 40 per cent., if he could have 75 per cent. of the cargo also as salvage service. The agent of the vessel's owners accepted this proposition. The libelant communicated this offer to the consignees and insurers. without receiving any reply. Libelant took a lighter, a tug, and 12 men. and in 2 days had the top-hamper ashore safely. He secured the services of a large steam wrecking vessel, having a foreman and two men, and with his own lighter and tug proceeded to pump the coal out of the hull. After getting a small part out, by the aid of the current the vessel was raised and, with difficulty, gotten ashore on the same day. Shortly afterwards the coal was removed. The top-hamper alone was worth $800 to $1,000, and the schooner and hamper

were worth $1,200 to $1,500, and the coal was worth $1,575. The owners of the vessel paid libelant $600 more than 70 per cent. of his estimate of the value, and the insurers offered him their interest in the cargo for $600. The steam wrecking vessel usually earned $100 per day, and libelant paid her owners $600 for her services, which were indispensable to the saving of the vessel and cargo. *Held* that, considering the pecuniary risk and expense incurred by libelant, he should receive $1,000 for his salvage service upon the cargo.

**2. SAME—APPORTIONMENT.**

While, as a general rule. the same ratio of assessment of salvage service should be applied to all the property, the expense of saving the hull and cargo being so much greater than that connected with the top-hamper, a higher rate of salvage should also be allowed.

**8. SAME.**

Whether the vessel owners' agent was authorized to contract on behalf of the owners of the cargo as to the rate of salvage or not, the contract made by him, by which he secured better terms for the vessel at the expense of the cargo owners, tended to unfairness, and should not be enforced.

In Admiralty.

*Samuel Park*, for libelant.

*Walter C. Noyes*, for claimant.

SHIPMAN, J. This is a libel for salvage. The schooner Josiah White-house, bound from Port Johnston to Boston with 445 tons of coal, struck, about half past one o'clock on Monday morning, (April 29, 1889,) on the south-west part of Race Point, the southwestern point of Fisher's island, at the entrance of Long Island sound. The night was dark, and there was a thick fog. The crew were compelled to leave the vessel. On the 29th and 30th there was a strong wind from the south south-west, and the sea was rough. The vessel bilged and sank, and the main rail was under water. The locality is rocky, and full of boulders, and is an exceptionally bad place from which to save a vessel or cargo. At this time the prospect of saving either was poor. On the morning of the 30th Henry F. Kallock, the special agent of the owners, went to New London and saw the libelant, who is the owner of steam-vessels and a wrecking equipment, and makes wreck-saving his business, who offered to try and save the top-hamper for 50 per cent. of its value, if successful. On the evening of that day he said he would endeavor to save the top-hamper for 40 per cent.; in case of success, if he could have 75 per cent. upon the cargo as a salvage service. This offer was accepted by Kal-loch, who had no express authority from the owners of the cargo, or its insurers. He telegraphed to the consignees of the coal, but without reply. The libelant telegraphed to the shippers, offering to save the cargo for 75 per cent. in case of success. They told him to telegraph the insurers, which he did, and made the same offer. They made no reply. On Wednesday the libelant went to the wreck with a lighter and 1 tug and 12 men. They took all the top-hamper from the wreck, carried it to New London, and on Thursday put it ashore. He telegraphed to Poughkeepsie for the steamer Chester, a large steam wrecking vessel, with a large steam pump, which could pump coal. This vessel reached New London on Friday evening, and on the next morning (May 4th) went to the wreck with the libelant's lighter and tug. The Chester had

two men and a foreman.  The libelant had eight men.  After pumping about 20 tons of coal from the stern of the schooner, the current, which is always strong at that part of the Race, struck her broadside.  She swung off and was towed into New London on the same day.  She was leaking.  The libelant sent divers under her to ascertain her injuries. Steam pumps were employed to prevent her sinking.  On May 9th the coal was libeled, and was bonded and removed from the vessel on May 10th.  The value of the top-hamper was $800 to $1,000.  The value of the vessel and hamper was $1,200 to $1,500.  The owners of the vessel settled with the libelant for $600.  They paid more than 70 per cent. of the libelant's estimate of the value of the vessel.  The value of the coal was $1,574.70.  The insurers offered to sell the libelant their interest in the cargo, subject to his lien, for $800.  No other offer of settlement was made.  The Chester was accustomed to charge, and did charge, $100 per day from the time she left her wharf until she returned to it. The libelant paid her owners $600 for her services.  The undertaking upon which he entered was an expensive one, and with little promise of as complete and prompt success as he had, and could not have been accomplished without the aid of appliances such as were on board the Chester.

Without considering the question whether Kalloch had implied authority to represent the owners of the cargo, I think that the contract under which Scott reduced his offer of 50 per cent. upon the top-hamper to 40 per cent., upon condition that he could have 75 per cent. of the value of the cargo, if successful, was a contract which tended to unfairness. If the agent, who particularly represents the owners of the vessel, is permitted to obtain better terms for the vessel, by making a contract in regard to the cargo which is favorable to the salvor, such a negotiation, if allowed and sanctioned by the courts, would result in injustice towards the absent party.  The court is therefore not obliged to carry out the agreement.  *The Vesta,* 2 Hagg. Adm. 189; *The Albion Lincoln,* 1 Low. 71.

At the same time the libelant should receive large compensation.  He took a serious pecuniary risk upon himself.  The expenses were onerous, and he was very fortunate in saving the entire cargo.  A very competent witness for the complainant testified that $1,000 or $1,200 would have been a fair contract price for the attempted services to vessel and cargo, without reference to a salvage service.  Under all the circumstances of pecuniary risk and expense to the libelant, $1,000 is a proper sum to be allowed him for his salvage service upon the cargo.  It is true that, "as a general rule, the court will not assess a different ratio of salvage upon different parts of the property according to the labor expended upon those parts, although it may do so if the justice of the case requires it." *The Albion Lincoln,* 1 Low. 71.  The assessment of $1,000 upon the cargo is a different ratio from that which the libelant accepted upon the top-hamper, but the large expenses of the Chester were necessary to save the hull and cargo, while the services upon the top-hamper were far less expensive.  I think that the justice of the case requires that the difference which the libelant recognized should be regarded, and that, if the

amount of salvage upon the cargo should be cut down to 40 or 50 per cent., the result would be inequitable. Let judgment be entered for the libelant for $1,000, and costs.